UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

CENTER FOR BIOLOGICAL
DIVERSITY and EARTH ISLAND
INSTITUTE,

       Plaintiffs,

    v.

DEAN GOULD, Sierra National
Forest Supervisor; and UNITED
STATES FOREST SERVICE,

       Defendants.

CIV. NO. 1:15-01329 WBS GSA

MEMORANDUM AND ORDER RE: CROSS-
MOTIONS FOR SUMMARY JUDGMENT

_____

SIERRA FOREST PRODUCTS,

       Defendant-
       Intervenor.

----oo0oo----

       Plaintiffs Center for Biological Diversity and Earth

Island Institute brought this action against defendants Dean

Gould, the Sierra National Forest Supervisor, and the United

States Forest Service ("Forest Service"), alleging that

1

1  defendants violated the National Environmental Policy Act

2  ("NEPA") and the Administrative Procedure Act ("APA") in

3  approving the French Fire Recovery and Reforestation Project

4  ("French Fire Project").  Sierra Forest Products intervened as a

5  defendant.  Pursuant to Federal Rule of Civil Procedure 56,

6  plaintiffs and defendants both move for summary judgment.

7  I.    Factual and Procedural Background

8        Plaintiff Center for Biological Diversity is a non-

9  profit corporation involved in species and habitat protection

10 issues throughout North America.  (Compl. ¶ 10.)  Plaintiff Earth

11 Island Institute is a non-profit organization headquartered in

12 Berkeley, California whose purpose is to develop and support

13 projects that counteract threats to biological and cultural

14 diversity.  (Id. ¶ 12.)  One of Earth Island Institute's

15 projects, the John Muir Project, was formed to protect all public

16 forestlands from commercial exploitation that undermines science-

17 based ecological management.  (Id.)

18       Defendant Forest Service, an agency of the Department

19 of Agriculture, is responsible for the administration and

20 management of the federal lands at issue in this case.  (Id. at

21 6.)  Defendant Dean Gould is the Forest Supervisor for the Sierra

22 National Forest and is being sued in his official capacity.

23 (Id.)  Defendant-intervenor Sierra Forest Products contracted

24 with the Forest Service to purchase thirteen million board feet

25 of lumber that will be harvested as part of the French Fire

26 Project.  (Duysen Decl. ¶ 13 (Docket No. 26).)

27       The French Fire Project encompasses 13,832 acres of the

28 Bass Lake Ranger District, Sierra National Forest in North Fork,

1  California that were impacted by the July 2014 French Fire.

2  (Admin. R. ("AR") at 11.)  According to the Forest Service, the

3  objectives of the French Fire Project are to reforest the area,

4  manage wildfire fuels, make the area safer from falling dead or

5  damaged trees, maintain defensive fuel profile zones for fighting

6  future wildfires, provide wildlife habitat, reduce soil erosion,

7  protect a powerline from future wildfire, eradicate invasive

8  weeds, and provide jobs and valuable raw materials for the

9  economy.  (AR at 15.)  The project authorizes the treatment and

10  logging of 5,965 acres--half of the total affected fire area.

11  This includes the removal and sale of fire-affected trees on

12  3,371 acres.  (Id. at 16.)

13       In their Complaint, plaintiffs allege the French Fire

14  Project will log over 1,000 acres of roadless areas that could

15  become designated as wilderness areas under the Wilderness Act of

16  1964, 16 U.S.C. § 1131 ("Wilderness Act"), and provide important

17  habitat for imperiled species, such as the black-backed

18  woodpecker, California spotted owl, and Pacific fisher.  (Compl.

19  ¶¶ 30-31.)  Plaintiffs claim defendants violated NEPA and the APA

20  by failing to disclose, and invite public comment regarding, the

21  French Fire Project's impacts on roadless areas before issuing a

22  final decision; failing to make the Wilderness Resource Impact

23  Analysis available for public comment; failing to take a "hard

24  look" at the vast impacts on roadless areas in their Wilderness

25  Resource Impact Analysis; and failing to prepare an Environmental

26  Impact Statement.  (Id. ¶¶ 44-62.)

27       On October 20, 2015, plaintiffs filed this motion for

28  summary judgment on their NEPA and APA claims.  (Docket No. 30-

3

1   1.)   Plaintiffs request the court to vacate the Environmental

2   Assessment ("EA") and Decision Notice and Finding of No

3   Significant Impact ("DN/FONSI") and remand to the agency for

4   consideration of the French Fire Project's impacts on roadless

5   areas.   Plaintiffs request the court vacate the DN's

6   authorization of logging within the roadless areas.   On October

7   30, 2015, defendants Forest Service and Gould filed a cross-

8   motion for summary judgment.   (Forest Serv.'s Mem. (Docket No.

9   35-1).)   On November 4, 2015, defendant-intervenor Sierra Forest

10  Products also filed a cross-motion for summary judgment.   (Docket

11  No. 36.)

12  II.   Discussion

13         A. Standing

14             Defendants do not argue that plaintiffs lack standing.

15  Chad Hanson is the director and staff ecologist of the John Muir

16  Project, a project of the Earth Island Institute, and also a

17  member of the Center for Biological Diversity.   (Hanson Decl. ¶ 3

18  (Docket No. 30-3).)   He states in his declaration that he

19  regularly visits post-fire habitat areas of the Sierra Nevada for

20  his research and recreation.   (Id. ¶ 5.)   He visited areas of the

21  Sierra National Forest impacted by the French Fire in the spring

22  of 2015 and plans to return around April 12, 2016.   (Id. ¶ 7.)

23  His ability to do research in large, unlogged areas will be

24  diminished by the logging and treatment, as will his ability to

25  enjoy the wild character and aesthetics of the area.   (Id. ¶ 9.)

26  Similarly, Douglas Bevington, a member of the Center for

27  Biological Diversity, has visited the Sierra National Forest to

28  bird-watch and plans to visit the roadless areas where the French

4

1   Fire occurred on June 8, 2016.  (Bevington Decl. ¶¶ 2-5.)  He

2   explains that he will be personally affected by the French Fire

3   Project logging as it will scar the area aesthetically and reduce

4   his ability to see wildlife, such as the black-backed woodpecker,

5   in the burned roadless areas.  (Id. ¶ 7.)  These facts are

6   sufficient to confer standing on plaintiffs to bring this suit.

7   See Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846,

8   859-62 (9th Cir. 2005) (discussing standing requirements in the

9   context of suit under NEPA).

10       B. Summary Judgment

11           Judicial review of actions by administrative agencies

12   is governed by the APA.  Under the APA, the reviewing court must

13   set aside agency actions found to be "arbitrary, capricious, an

14   abuse of discretion, or otherwise not in accordance with law."  5

15   U.S.C. § 706(2)(A).  This is a "deferential standard . . .

16   designed to ensure that the agency considered all of the relevant

17   factors and that its decision contained no clear error of

18   judgment."  Pac. Coast Fed'n of Fishermen's Ass'n v. Nat'l Marine

19   Fisheries Serv., 265 F.3d 1028, 1034 (9th Cir. 2001) (citation

20   omitted).  An agency action should be overturned only when the

21   agency has "relied on factors which Congress has not intended it

22   to consider, entirely failed to consider an important aspect of

23   the problem, offered an explanation for its decision that runs

24   counter to the evidence before the agency, or is so implausible

25   that it could not be ascribed to a difference in view or the

26   product of agency expertise."  Id. (citation omitted).  The court

27   must ask whether an agency considered "the relevant factors and

28   articulated a rational connection between the facts found and the

1  choice made." Nat'l Res. Def. Council v. U.S. Dep't of the

2  Interior, 113 F.3d 1121, 1124 (9th Cir. 1997) (citation omitted).

3        The court is not empowered to substitute its judgment

4  for that of an agency. Ariz. Cattle Growers' Ass'n v. U.S. Fish

5  & Wildlife Serv., 273 F.3d 1229, 1236 (9th Cir. 2001) (citing

6  Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402,

7  416, (1971)). The court defers to an agency's "interpretation of

8  its own regulations . . . unless plainly erroneous or

9  inconsistent with the regulations being interpreted." Ctr. For

10 Biological Diversity v. U.S. Forest Serv., 706 F.3d 1085, 1090

11 (9th Cir. 2013) (citation omitted). Moreover, the court should

12 review an agency's actions based on the administrative record

13 presented by the agency. See Ctr. for Biological Diversity v.

14 U.S. Fish & Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006).

15 The court's role on motions for summary judgment is not to

16 resolve contested fact questions which may exist in the

17 underlying administrative record, but "to determine whether or

18 not, as a matter of law, the evidence in the administrative

19 record permitted the agency to make the decision it did."

20 Nehemiah Corp. v. Jackson, 546 F. Supp. 2d 830, 838 (E.D. Cal.

21 2008); see also Occidental Eng'g, Co. v. INS, 753 F.2d 766, 769-

22 70 (9th Cir. 1985).

23     C. Statutory Framework

24        NEPA is "our basic national charter for protection of

25 the environment . . . [i]t establishes policy, sets goals . . .

26 and provides means for carrying out the policy." 40 C.F.R.

27 § 1500.1(a). NEPA "does not set out substantive environmental

28 standards, but instead establishes 'action-forcing' procedures

6

1    that require agencies to take a 'hard look' at environmental

2    consequences."  Metcalf v. Daley, 214 F.3d 1135, 1141 (9th Cir.

3    2000) (citations omitted).

4         Through the Wilderness Act of 1964, Congress created

5    the National Wilderness Preservation System to provide protection

6    for lands relatively untouched by human activity.  See 16 U.S.C.

7    §§ 1131-36; Nat'l Audubon Soc'y v. Forest Serv., 46 F.3d 1437,

8    1440 (9th Cir. 1993).  The Wilderness Act defines wilderness as

9    "an area where the earth and its community of life are

10   untrammeled by man, where man himself is a visitor who does not

11   remain . . . undeveloped Federal land retaining its primeval

12   character and influence, without permanent improvements or human

13   habitation."  16 U.S.C. § 1331(c).  The Act seeks to protect and

14   manage land that:

15        (1) generally appears to have been affected primarily
          by the forces of nature, with the imprint of man's work
16        substantially unnoticeable; (2) has outstanding
          opportunities for solitude or a primitive and
17        unconfined type of recreation; (3) has at least five
          thousand acres of land or is of sufficient size as to
18        make practicable its preservation and use in an
          unimpaired condition; and (4) may also contain
19        ecological, geological, or other features of
          scientific, educational, scenic, or historical value.

20

21   Id.  The Wilderness Act put in place a process under which the

22   Forest Service, in order to aid Congress in designating

23   "wilderness," reviews "primitive" areas of the national forests

24   to determine their "suitability or nonsuitability for

25   preservation as wilderness."  Id. § 1132(b).

26        In 2012, the Forest Service issued the National Forest

27   System Planning Rule ("2012 Planning Rule") to guide "the

28   development, amendment, and revision of land management plans for

                                   7

1   all units of the National Forest System (NFS)."   77 Fed. Reg. §

2   21162-01.   The 2012 Planning Rule provides that "in developing a

3   proposed new plan or proposed plan revision" the Forest Service

4   must "[i]dentify and evaluate lands that may be suitable for

5   inclusion in the National Wilderness Preservation System and

6   determine whether to recommend any such lands for wilderness

7   designation."   36 C.F.R. § 219.7(c)(2)(v).   The Sierra National

8   Forest is an early adopter of the 2012 Planning Rule and, as a

9   result, is currently revising its Forest Plan and compiling an

10   inventory of lands that may be suitable for inclusion in the

11   National Wilderness Preservation System.   (Burkindine Decl. ¶¶ 1-

12   3 (Docket No. 34-4).)

13      D. Analysis of the French Fire Project's Impact on Roadless

14         Areas

15         Plaintiffs challenge whether the Forest Service

16   conducted a proper analysis of the French Fire Project's impact

17   on roadless areas that could potentially be classified as

18   wilderness.   Plaintiffs argue that three Ninth Circuit cases,

19   Lands Council v. Martin, 529 F.3d 1219 (9th Cir. 2008); Smith v.

20   Forest Serv., 33 F.3d 1072 (9th Cir. 1994), and National Audubon

21   Society v. Forest Service, 46 F.3d 1437 (9th Cir. 1993), require

22   the Forest Service to make a public disclosure in its NEPA

23   documents if a project will impact a 5,000 acre roadless area--

24   even if the area has not been designated as wilderness land and

25   does not qualify for future designation under the current

26   regulations.   Further, the cases require the consideration of the

27   unique attributes of roadless areas.

28         In Smith, the Ninth Circuit held that the Forest

8

1    Service's "obligation to take a 'hard look' at the environmental

2    consequences of the proposed sale and consider a no-action

3    alternative require[d] it, at the very least, to acknowledge the

4    existence of the 5,000 acre roadless area."  33 F.3d at 1079.

5    The Forest Service had authorized the harvest and sale of timber

6    in the Colville National Forest on 6,000 roadless acres--4,246 of

7    which were uninventoried and 2,000 of which were inventoried as

8    released for non-wilderness use.  Id. at 1074, 1077.  This land

9    did not qualify for wilderness classification under the

10   Wilderness Act because a portion of the land was inventoried and

11   the remainder was smaller than 5,000 acres.

12        Nevertheless, the Ninth Circuit held that the Forest

13   Service had an obligation to acknowledge the existence of the

14   5,000 acre roadless area because "'the decision to harvest timber

15   on a previously undeveloped tract of land is an irreversible and

16   irretrievable decision which could have serious environmental

17   consequences.'"  Id. at 1078 (quoting Audubon, 46 F.3d at 1448).

18   While the Forest Service argued that roadless character is

19   "merely a synonym for specific environmental resources, including

20   soil quality, water quality, vegetation, wildlife and fishery

21   resources, recreational value, and scenic quality"--all of which

22   were addressed in its EA--the Ninth Circuit made clear that

23   addressing the impact on these resources in the logging area is

24   not sufficient.  Id.  The NEPA documents failed to consider "the

25   remaining thousands of acres of roadless land . . . that will no

26   longer be part of a 5,000 acre roadless expanse."  Id.  The Ninth

27   Circuit explained that while this land did not qualify as

28   wilderness under current regulations, it is possible the

9

1  "wilderness option for inventoried lands may be revisited in

2  second-generation Forest Plans." Id. at 1078. The "possibility

3  of future wilderness classification triggers, at the very least,

4  an obligation on the part of the agency to disclose the fact that

5  development will affect a 5,000 acre roadless area," even if the

6  Forest Service is under no obligation to preserve this land. Id.

7            Similarly, in Martin, the Ninth Circuit found that the

8  Forest Service's EIS did not comply with the requirements of

9  Smith because the roadless areas impacted by a post-fire logging

10  project were not "discussed in the context of their potential for

11  wilderness designation." 529 F.3d at 1230. Nowhere in the EIS

12  did the Forest Service disclose that logging would occur on 1,000

13  roadless acres of uninventoried land that were contiguous to an

14  inventoried roadless area of 12,000 acres. Id. at 1232. Neither

15  did it acknowledge that another logging area was of sufficient

16  size as to make practicable its preservation and use in an

17  unimpaired condition. Id. This, the court found, failed to

18  "meet even the bare minimum requirement discussed in Smith" of

19  disclosure and analysis in the broader context of contiguous

20  land. Id.

21            In this case, the Forest Service issued a draft EA on

22  May 7, 2015, which contained no overt discussion of roadless or

23  wilderness areas. In response, plaintiffs submitted a comment

24  letter noting that it had "identified two uninventoried roadless

25  areas (both over 5,000 acres--see attached map) in the project

26  area, and both have proposed logging units within them." (AR at

27  3199.) Plaintiffs emphasized that the draft EA failed to

28  disclose or "analyze the impacts and cumulative effects of

1   logging these areas . . . with regard to future Wilderness

2   designation--and the loss of ability to qualify as Wilderness if

3   these areas are logged" and an EIS needed to be prepared.  (Id.)

4   The map submitted by plaintiffs was prepared by the Center for

5   Biological Diversity's Geographic Information Systems ("GIS")

6   specialist, Curtis Bradley, (Bradley Decl. ¶¶ 2-3 (Docket No. 30-

7   6)), and allegedly demonstrates that over 1,000 acres of the

8   French Fire's logging falls within roadless areas of 5,000 acres

9   or more that could someday be designated as wilderness.  (AR at

10  3816.)  Plaintiffs created this map by determining "all Forest

11  Service lands that were further than 100 meters from a road in

12  order to focus on roadless areas and to avoid roadside hazard

13  treatments."  (Bradley Decl. ¶ 5.)

14          In response to plaintiffs' comment letter and map, the

15  Forest Service prepared a Wilderness Resource Impact Analysis

16  ("Wilderness Analysis") that analyzed the effects of the Project

17  on future potential wilderness areas.  (AR at 2206.)  In

18  assessing the potential wilderness impact, the Forest Service

19  relied on final inventory maps that had been prepared as part of

20  the separate inventory revision process under the 2012 Planning

21  Rule.  (Id.)  As discussed above, in implementing the 2012

22  Planning Rule, the Forest Service is required to "identify all

23  lands in the plan area that may have wilderness characteristics

24  as defined in the Wilderness Act."  (Id.)  While plaintiffs are

25  correct that these maps are not yet final since the public

26  comment process is ongoing, the court disagrees that it was

27  "premature" for the Forest Service to rely on these maps.  (Pls.'

28  Mem. at 14.)  The inventory maps are the Forest Service's current

11

1    best assessment of which land may qualify for wilderness

2    classification and they have been made available to the public

3    for review and comment as part of the 2012 Planning Rule process.

4    (Burkindine Decl. ¶¶ 9-11.)

5              Contrary to the plaintiffs' findings, the Forest

6    Service's inventory maps suggest that only "142 acres of

7    inventoried potential wilderness acres overlap Project treatment

8    units." (AR at 2210.)  To conduct its inventory, the Forest

9    Service excluded all lands "less than half a mile across between

10   roads, because they are not of sufficient size as to make

11   practicable their preservation and use in unimpaired condition."

12   (Id. at 2218.)  The Forest Service used these road buffers to

13   bound areas into polygons that could be considered for potential

14   wilderness values.  (Burkindine Decl. ¶ 3.)  The Forest Service

15   also removed transmission and powerline corridors from the

16   inventory since the areas do not have wilderness characteristics

17   and it was likely that utility companies would need to develop an

18   access road to the areas in the future.  (Id. ¶ 4.)  The Forest

19   Service created a one-half mile buffer around these areas because

20   it "concluded that people within one-half mile could likely see

21   and hear signs of human mechanized activities, and those sights

22   and sounds would degrade the wilderness experience." (Id. ¶ 5.)

23   Lastly, the Forest Service excluded narrow strips of land between

24   roads that would not exhibit wilderness character.  (Id. ¶ 6.)

25             Plaintiffs argue that the Forest Service's half-mile

26   buffer is arbitrary as it is not found anywhere in Chapter 70 of

27   the Forest Service Land Management Planning Handbook.  See FSH

28   1909.12, Chapter 70.  However, plaintiffs' 100-yard buffer is

1   also not dictated by the handbook.  Given the highly deferential

2   standard of review under the APA, the court must find that the

3   Forest Service's calculation of 142 acres, rather than

4   plaintiffs' 1,000 acres, is reasonable.  The Forest Service

5   explains its rationale for the inventorying method and there

6   appears to be a rational connection between the facts found while

7   inventorying the French Fire Project area and the conclusions

8   regarding wilderness designation.  See Motor Vehicle Mfrs. Ass'n

9   of U.S., Inc. v. State Farm Mut. Auto. Ins. Co, 463 U.S. 29, 43

10  (1983) ("[T]he agency must examine the relevant data and

11  articulate a satisfactory explanation for its action including a

12  rational connection between the facts found and the choice

13  made.") (citation omitted).

14          The Forest Service's Wilderness Analysis explains that

15  it is not likely to consider for wilderness inclusion in the

16  Forest Plan Revision under the 2012 Planning Rule the 142 acre

17  portion of the polygons that overlap with French Fire Project

18  treatment units, "because the two polygons either lack of

19  wilderness character, are not manageable, or both."  (AR at

20  2210.)  The Forest Service concluded that the wilderness

21  character of this land has been compromised by human manipulation

22  from defensive fuel profile zones, regular plantation planting

23  patterns, and proximity to roads associated with motorized use.

24  (Id. at 2215-16.)  Moreover, the Forest Service found that "even

25  if the larger areas were subsequently found to have the requisite

26  wilderness characteristics in the future, any resulting

27  wilderness recommendation could redraw the proposed wilderness

28  boundaries to excise the 142 acres treated with no loss to the

13

1  remaining area's wilderness potential."  (Id. at 2216-17.)

2          The Ninth Circuit cases, therefore, are distinguishable

3  from this case because the French Fire Project does not involve

4  an "irreversible and irretrievable decision which could have

5  serious environmental impacts."  Audubon, 46 F.3d 1437, 1448 (9th

6  Cir. 1993) (citation omitted).  A disclosure of the roadless

7  character was not necessary because, unlike in Smith and Martin,

8  the treatment of the 142 acre area will not disqualify the

9  surrounding land from designation as wilderness in the future.

10 Moreover, as directed by the Ninth Circuit, the Forest Service

11 considered the French Fire Project in the context of the greater

12 "roadless expanse," Martin, 529 F.3d at 1231, and concluded that

13 the impacted acres could easily be excised from the broader areas

14 of national forest lands.  The French Fire Project will not

15 destroy the possibility of future wilderness designation.  In

16 addition, though the Wilderness Analysis did not explicitly

17 discuss the French Fire Project's impact on a 5,000 acre roadless

18 area, it thoroughly considered the possibility of future

19 wilderness designation.  The court therefore finds that the

20 Forest Service both considered the area's potential for future

21 wilderness designation and complied with Ninth Circuit

22 precedent.[1]

23 _____

24         [1]    Defendants also argue that "[e]ven if National Audubon,
   Smith, or Martin had recognized some free-floating requirement to
25 analyze 'uninventoried roadless areas,' which they did not, the
   2012 Planning Rule makes those cases obsolete" because the new
26 regulation only requires analysis of areas that may have
   wilderness characteristics, not roadless areas.  (Forest Serv.'s
27 Mem. at 12.)  However, the Ninth Circuit cases require disclosure
   of roadless areas, even if the roadless areas do not qualify for
28 wilderness designation under the current regulations.  As a

                              14

1          E. Opportunity for Public Comment on Potential Impact on

2             Wilderness and Roadless Areas

3          Under NEPA, the agency "must insure that environmental

4    information is available to public officials and citizens before

5    decisions are made and before actions are taken."  40 C.F.R.

6    § 1500.1.  In preparing an EA, "the agency shall involve

7    environmental agencies, applicants, and the public, to the extent

8    practicable."  Id. § 1501.4(b).  Determining whether the public

9    was adequately involved is "a fact-intensive inquiry made on a

10   case-by-case basis."  Natural Res. Def. Council, Inc. v. U.S.

11   Forest Serv., 634 F. Supp. 2d 1045, 1067 (E.D. Cal. 2007)

12   (citation omitted).

13         Although the Ninth Circuit has "not established a

14   minimum level of public comment and participation required by the

15   regulations governing the EA and FONSI process, [it] clearly

16   [has] held that the regulations at issue must mean something."

17   Citizens for Better Forestry v. U.S. Dep't of Agric., 341 F.3d

18   961, 970 (9th Cir. 2003) ("[A] complete failure to involve or

19   even inform the public about an agency's preparation of an EA and

20   a FONSI, as was the case here, violates these regulations."); see

21   also Sierra Nev. Forest Prot. Campaign v. Weingardt, 376 F. Supp.

22   2d 984, 991 (E.D. Cal. 2005) (Levi, J.) ("The way in which the

23   information is provided is less important than that a sufficient

24   amount of environmental information--as much as practicable--be

25   provided so that a member of the public can weigh in on the

26

27   result, this is not a prevailing argument and the court does not
     find that the 2012 Planning Rule rendered National Audubon,
28   Smith, or Martin obsolete.

15

1 significant decisions that the agency will make."). "An agency,

2 when preparing an EA, must provide the public with sufficient

3 environmental information, considered in the totality of

4 circumstances, to permit members of the public to weigh in with

5 their views and thus inform the agency decision-making process."

6 Bering Strait Citizens for Responsible Resource Dev. v. U.S. Army

7 Corps of Eng'rs, 524 F3d 938, 953 (9th Cir. 2008).

8         In Weingardt, the court found that the Forest Service

9 "failed to give the public an adequate pre-decisional opportunity

10 for informed comment" where it distributed a scoping letter but

11 no draft EA. 376 F. Supp. 2d at 992.[2] While the court explained

12 that, "depending on the circumstances, the agency could provide

13 adequate information through public meetings or by a reasonably

14 thorough scoping notice," it found that the Forest Service had

15 not released "sufficient environmental information about the

16 various topics" addressed in the EA prior to its finalization.

17 Id. For example, the scoping notice provided no environmental

18 data concerning impacts to wildlife, cultural resources,

19 watersheds, soils, fisheries, or aquatics. Id. Further, it

20 provided no discussion of the potential cumulative effects that

21 were discussed in the final EA. Id.

22         In this case, the Forest Service had two distinct

23 comment periods: thirty days following both the scoping notice

24 and the draft EA. (AR at 1153, 1118.) The scoping process

25 included a public meeting and publication of a project

26 _____

27     [2]    This decision was cited with approval by the Ninth
Circuit in Bering Strait. 524 F.3d at 953 ("The district court in
Sierra Nevada Forest Protection Campaign [v. Weingardt] evaluated
28 this issue soundly, and we commend its approach.").

description and two maps of the French Fire Project.  Neither

map, however, identified roadless areas or areas with potential

for future wilderness designation.[3]  (Id. at 6124, 6313-14,

6324.)  The draft EA also contained no discussion whatsoever of

roadless areas or wilderness designation.  Further, neither the

scoping notice nor the draft EA published the inventory maps

created for the 2012 Planning Rule process or revealed that the

Forest Service would rely on the inventory maps in assessing

wilderness potential.

The Wilderness Analysis, which was published on the

same day as the final EA and DN/FONSI, was the first Forest

Service document to explicitly address potential wilderness

designation.  It was in this document that the Forest Service

revealed that it was relying on the inventory maps, 142 acres of

potential wilderness area would be impacted by the French Fire

Project, and the 142 acres were not likely to be designated as

wilderness.  There was no opportunity for public comment on the

Wilderness Analysis.

Defendants argue that though the Forest Service did not

specifically identify roadless areas or potential wilderness

areas in its scoping notice or draft EA, the Forest Service

provided the public with the tools necessary to analyze these

---

[3]     The first map attached to the scoping notice shows the
location of the French Fire, the borders of the surrounding
national parks, wilderness boundaries, and main highways.  (AR at
6314.)  The second map is zoomed in on the French Fire area and
highlights the areas identified for plantation analysis,
Medusahead analysis, powerline buffer analysis, defensive fuel
profile zone buffer analysis, hazard tree salvage analysis, and
potential treatment units.  (Id. at 6324.)

1   issues during the comment periods.  (Forest Serv.'s Mem. at 15.)

2   This is made clear, defendants argue, by plaintiffs' comment

3   letter, which relied on the information provided and identified

4   that logging might impact possible wilderness areas.  (Id.)

5          While plaintiffs were able to deduce from the scoping

6   notice and draft EA that the French Fire Project may impact

7   wilderness areas, other members of the public might have weighed

8   in had the issue been explicitly raised in either the scoping

9   notice or draft EA.  Moreover, plaintiffs would have been able to

10  submit a more complete comment if they had access to the

11  information in the Wilderness Analysis.  Cf. Sierra ForestKeeper

12  v. Elliot, 50 F. Supp. 3d 1371, 1388 (E.D. Cal. 2014) (Ishii, J.)

13  ("[A] court reviewing an agency decision under NEPA can only

14  provide relief to a challenging party if it can be shown that

15  information that was not before the agency would, if properly

16  considered, present a seriously different picture of the

17  environmental landscape.") (citation omitted).

18         Plaintiffs specifically identify several important

19  pieces of information they would have presented to the Forest

20  Service if they had been given an opportunity to comment on the

21  Wilderness Analysis.  First, plaintiffs argue that if they had

22  known the Forest Service would rely on the inventory maps, they

23  would have had a GIS expert analyze the inventory maps to verify

24  or discredit the Forest Service's assertions.  (Pl.'s Reply &

25  Opp'n at 7 (Docket No. 38).)  It is possible that this analysis

26  would have revealed new information or called into question the

27  Forest Service's assessment of the area.  While the inventory

28  maps were publicly available, it was unreasonable to expect the

18

1   plaintiffs or other members of the public to predict that the

2   inventory maps, created for an entirely separate purpose, would

3   be relied upon in analyzing the French Fire Project.  Second,

4   plaintiffs would have provided pictures and videos of the area to

5   challenge the Forest Service's finding that specific areas lacked

6   wilderness potential.  (Id.)  Lastly, plaintiffs argue they would

7   have been better able to challenge the Forest Service's

8   wilderness assessment and articulate why it did not comply with

9   applicable law.  (Id.)  Specifically, plaintiffs would have

10  attacked the criteria the Forest Service used for creating buffer

11  zones, assessing powerline corridors, and assessing areas with

12  signs of fire suppression actions.  (Pls.' Mem. at 16.)

13          While there is no established minimum requirement for

14  involving the public in the Ninth Circuit, the court finds that

15  the Forest Service did not provide adequate pre-decisional

16  opportunity for public comment on its Wilderness Analysis.  The

17  Forest Service did not provide the public with the environmental

18  information regarding wilderness designation that it needed to

19  weigh in with their views and inform the agency decision-making

20  process.  See Weingardt, 376 F. Supp. 2d at 992; Bering Strait,

21  524 F.3d at 953.  Accordingly, the court grants plaintiffs'

22  motion for summary judgment on the issue of public comment and

23  denies defendants' motion.  The Forest Service must provide a

24  public opportunity to comment on the Wilderness Analysis and

25  respond to comments received.[4]

---

26          [4]   Allowing additional time for public comment will not
27  unduly burden defendants.  Sierra Forest Products has informed
    the court that it has suspended logging operations due to
28  weather.  (Joint Status Report at 2 (Docket No. 43).)  If the

1          F. Necessity of an EIS

2              Plaintiffs next challenge the decision of the Forest

3  Service not to prepare an EIS for the French Fire Project.  The

4  relevant provision of NEPA provides that "all agencies of the

5  Federal Government shall . . . include in every recommendation or

6  report on proposals for legislation and other major Federal

7  actions significantly affecting the quality of the human

8  environment, a detailed statement by the responsible official on

9  (i) the environmental impact of the proposed action."  42 U.S.C.

10  § 4332(2)(C).  "Where an EIS is not categorically required, the

11  agency must prepare an Environmental Assessment to determine

12  whether the environmental impact is significant enough to warrant

13  an EIS."  Ocean Advocates, 402 F.3d at 864.  If, after

14  preparation of the EA, the agency decides not to prepare an EIS,

15  it must put forth a "convincing statement of reasons that explain

16  why the project will impact the environment no more than

17  insignificantly."  Id. (citation omitted); see also 40 C.F.R. §

18  1508.13 (listing requirements for a FONSI).  The FONSI is crucial

19  to a court's evaluation of whether the agency took the requisite

20  "hard look" at the potential impact of a project.  Ocean

21  Advocates, 402 F.3d at 864.

22              To prevail on a claim seeking an EIS, a plaintiff "need

23  not demonstrate that significant effects will occur.  A showing

24  that there are substantial questions whether a project may have a

25  ───────────────────────────────────────────────

26  winter brings dry conditions, Sierra Forest Products may be able
   to resume operations in January or February 2016.  However, if
27  there are wet conditions, operations will not resume until July
   1, 2016 because the French Fire Project guidelines prohibit
28  logging from March 1, 2016 through June 30, 2016.  (Id.)

1   significant effect on the environment is sufficient."  Anderson

2   v. Evans, 371 F.3d 475, 488 (9th Cir. 2002) (citation omitted).

3   The NEPA implementing regulations promulgated by the Council on

4   Environmental Quality ("CEQ") provide that "significantly as used

5   in NEPA requires considerations of both context and intensity."

6   40 C.F.R. § 1508.27.  Courts evaluate intensity, which "refers to

7   the severity of impact," by considering a number of factors.  Id.

8   § 1508.27(b).  "[O]ne of these factors may be sufficient to

9   require preparation of an EIS in appropriate circumstances."

10  Ocean Advocates, 402 F.3d at 865.

11          Plaintiffs argue that an EIS was required based on the

12  following four intensity factors: (1) unique characteristics of

13  the geographic area; (2) degree to which the effects on the

14  quality of the human environment are likely to be highly

15  controversial; (3) the degree to which the possible effects

16  involve unique risk; and (4) the degree to which the action may

17  establish a precedent for future actions with significant effects

18  or represents a decision in principle about a future

19  consideration.  Further, plaintiffs argue defendants failed to

20  provide a convincing statement of reasons for failing to conduct

21  an EIS.

22          a. Unique Characteristics of the Geographic Area

23          Even if Smith, Martin, and Audubon were not

24  distinguishable from this case, the logging of a roadless area

25  does not automatically require an EIS analysis.  Smith makes

26  clear that while logging roadless areas "could have serious

27  environmental consequences," an "EIS may not be per se required

28  under such circumstances."  33 F.3d at 1078-79 (citation

21

1   omitted).   In fact, though the Ninth Circuit held that the Forest

2   Service's NEPA documents were insufficient in <u>Smith</u>, the court

3   let the agency decide how best to comply with NEPA and its

4   implementing regulations.   <u>Id.</u> at 1079.

5          In this case, the Forest Service found that the impact

6   of the French Fire Project on any future potential wilderness

7   designation would be negligible.   In its final DN/FONSI, the

8   Forest Service wrote that:

9        The Project does occur on approximately 142 acres
         within polygons inventoried for potential wilderness
10       designation as part of the Sierra NF plan revision
         process.   An analysis was done on these impacts and the
11       character of the area, and it was determined that the
         area lacks the requisite wilderness character for
12       designation.   Therefore the Project will not affect an
         area with unique characteristics (French Fire Recovery
13       and Restoration Project Wilderness Resource Impact
         Analysis, 8/26/2015).   Based on that evidence, it is
14       not reasonably foreseeable and it is not likely that
         the SNF will designate as potential wilderness any
15       areas that the French Project affects.

16   (AR at 34.)   This portion of the DN/FONSI directly addresses why

17   the French Fire Project will not impact an area with unique

18   characteristics.   The court therefore finds that an EA was

19   adequate and the agency's FONSI was not arbitrary and capricious.

20          b. <u>Degree to Which the Effects Are Likely to Be Highly</u>

21             <u>Controversial</u>

22          "A federal action is controversial if a substantial

23   dispute exists as to its size, nature or effect."   <u>Wetlands</u>

24   <u>Action Network v. Army Corps of Eng'rs</u>, 222 F.3d 1105, 1122 (9th

25   Cir. 2000), <u>abrogated on other grounds by</u> <u>Wilderness Soc. v.</u>

26   <u>Forest Service</u>, 630 F.3d 1173 (9th Cir. 2011) (citation omitted).

27   "A substantial dispute exists when evidence, raised prior to the

28   preparation of an EIS or FONSI, casts serious doubt upon the

1    reasonableness of an agency's conclusions."  Nat'l Parks &

2    Conservation Ass'n v. Babbitt, 241 F.3d 722, 736 (9th Cir. 2001)

3    (citation omitted).  Once this evidence is presented to the

4    agency, the agency has the burden of demonstrating why this

5    evidence does not create a controversy.  Id.  "The existence of

6    opposition to a use, however, does not render an action

7    controversial."  Wetlands Action Network, 222 F.3d at 1122.

8          Plaintiffs argue that this action is controversial

9    because there is a substantial dispute as to the size of the

10   roadless areas with potential for wilderness designation that

11   will be impacted.  (Pls.' Mem. at 18.)  While the court agrees

12   that this was a significant dispute earlier in the process, the

13   Forest Service specifically addressed these concerns by issuing a

14   Wilderness Analysis that explains the government's findings, the

15   maps it relied on, and the manner in which the maps were created.

16   (AR at 2206-10, 2211-15, 2218.)  NEPA requires only a

17   "'reasonably thorough' discussion of the environmental

18   consequences in question, not unanimity of opinion, expert or

19   otherwise."  City of Carmel-by-the-Sea v. U.S. Dep't of Transp.,

20   123 F.3d 1142, 1150-51 (9th Cir. 1997).  Moreover, "when faced

21   with conflicting evidence an agency may rely on its own

22   evidence."  Id. at 1151.  Accordingly, plaintiffs' argument that

23   an EIS was required because there was a substantial dispute as to

24   the size of the federal action fails.

25          c. Degree to Which the Possible Effects Involve Unique

26             Risk

27          The French Fire Project does not involve unique risk

28   even though certain roadless areas will be logged, see supra Part

                                    23

1   II.E.

2           d. <u>Degree to Which the Action May Establish a Precedent</u>

3           Plaintiffs argue that the Forest Service was required

4   to prepare an EIS because the French Fire Project sets a negative

5   precedent for future actions with significant effects as it will

6   allow the Forest Service to unilaterally determine, without

7   public input, the areas that are roadless and suitable for

8   wilderness designation.  (Pls.' Mem. at 19.)  The French Fire

9   Project will not set a negative precedent because, as is

10  explained in the Wilderness Analysis and final EA, there are no

11  significant effects from the treatment and logging in this case.

12  Moreover, the Forest Service did not act unilaterally but rather

13  sought public comment both during the scoping period and after

14  issuing a draft EA.  Accordingly, the court denies plaintiffs'

15  motion and grant defendants' on plaintiffs' NEPA claim that an

16  EIS was required.

17      G. <u>Adequacy of the Forest Service's DN/FONSI</u>

18          As discussed above, if any agency decides not to

19  prepare an EIS, it must put forth a "convincing statement of

20  reasons [in the form of a FONSI] that explain why the project

21  will impact the environment no more than insignificantly."  <u>Ocean</u>

22  <u>Advocates</u>, 402 F.3d at 864 (citation omitted).  The Forest

23  Service sufficiently addressed the factors that go toward a

24  court's determination of whether a project may have significant

25  effects in its DN/FONSI and Wilderness Analysis.  (<u>See</u> AR at 34-

26  35.)

27          For all of the foregoing reasons, plaintiffs' motion

28  for summary judgment is GRANTED to the extent that the Forest

1   Service is hereby ORDERED not to resume the logging of roadless

2   areas in the French Fire Project unless and until it complies

3   with the requirements of NEPA by providing a public opportunity

4   to comment on the Wilderness Analysis and responding to comments

5   received.  In all other respects, plaintiffs' motion is DENIED

6   and defendants' motion is GRANTED.

7   Dated:   December 11, 2015

8   WILLIAM B. SHUBB
    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28